[Cite as *Barcus v. Buehrer*, 2015-Ohio-3122.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Leonard G. Barcus, Jr., | : | |
| Plaintiff-Appellant, | : | |
| | | **No. 14AP-942** |
| v. | : | (C.P.C. No. 13CVD06-6200) |
| Stephen Buehrer, Administrator, Ohio Bureau of Workers' Compensation et al., | : | (ACCELERATED CALENDAR) |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

## D E C I S I O N

### Rendered on August 4, 2015

*Fox & Fox Co., L.P.A.*, *Bernard C. Fox, Jr.*, and *M. Christopher Kneflin*, for appellant.

*Calfee, Halter & Griswold LLP*, *William L.S. Ross*, and *Christopher M. Ward*, for appellee CEVA Freight, LLC.

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Plaintiff-appellant, Leonard G. Barcus, Jr., appeals a judgment of the Franklin County Court of Common Pleas that granted summary judgment to defendants-appellees, Stephen Buehrer, administrator of the Ohio Bureau of Workers' Compensation, and CEVA Freight, LLC ("CEVA").

{¶ 2} Barcus was a truck driver who delivered freight for CEVA, a full-service logistics company. Barcus alleges that he was injured while working for CEVA. Barcus sought workers' compensation benefits, but both a district hearing officer and a staff hearing officer denied Barcus' application. After the Industrial Commission refused

Barcus' appeal, Barcus appealed the denial of his claim to the trial court pursuant to R.C. 4123.512.

{¶ 3} CEVA answered Barcus' complaint and then moved for summary judgment. CEVA argued that because Barcus was an independent contractor, he was unable to participate in the workers' compensation fund. In response, Barcus asserted that he was CEVA's employee and, thus, entitled to workers' compensation benefits. In a decision and entry dated October 17, 2014, the trial court granted CEVA's motion, finding reasonable minds could only conclude that Barcus was an independent contractor.

{¶ 4} Barcus now appeals the October 17, 2014 judgment, and he assigns the following error:

> THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO APPELLEES AS THERE EXISTED GENUINE ISSUES OF MATERIAL FACT ON THE QUESTION OF WHETHER APPELLANT WAS AN EMPLOYEE AT THE TIME OF HIS INDUSTRIAL INJURY PURSUANTO [sic] TO THE TEST SET OUT IN *BOSTIC V. CONNOR*, 37 Ohio St.3d 144, 524 NE 2d 881(1988) [sic].

{¶ 5} Barcus's sole assignment of error challenges the trial court's ruling on summary judgment. A trial court will grant summary judgment under Civ.R. 56 when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, L.L.C.*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 6} Workers' compensation is limited to employees and their dependents. R.C. 4123.54. An independent contractor is not an employee for purposes of workers'

compensation law, and, consequently, an independent contractor is ineligible for workers' compensation benefits. *Bostic v. Connor*, 37 Ohio St.3d 144, 145 (1988).

{¶ 7}   Whether a person is an employee or independent contractor depends on the facts of the particular case, with the key question being who had the right to control the manner and means of doing the work. *Id.* at 146.   If the employer reserves the right to control the manner and means of doing the work, as well as the result, then an employer-employee relationship is created. *State ex rel. Nese v. State Teachers Retirement Bd.*, 136 Ohio St.3d 103, 2013-Ohio-1777, ¶ 33.   On the other hand, if the employer only specifies the result and the worker determines the manner and means of doing the job, then an independent contractor relationship is created.   *Id.*   In determining what kind of relationship exists, multiple factors must be considered, including who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools, and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts. *Bostic* at 146.

{¶ 8}   Due to the fact-intensive nature of the employee/independent contractor analysis, a trier of fact ordinarily ends up deciding whether a person is an employee or independent contractor.   *Id.* at 145-46.   If the evidence allows reasonable minds to reach different conclusions on that question, then a trial court must deny a motion for summary judgment and submit the matter to a trier of fact.   *Id.* at 147; *accord Brown v. CDS Transport, Inc.*, 10th Dist. No. 10AP-46, 2010-Ohio-4606, ¶ 10.   However, where the evidence is not in conflict or the facts are admitted, the trial court may determine, as a matter of law, whether a person is an employee or independent contractor.   *Bostic* at 146.

{¶ 9}   Here, the parties do not dispute any facts but, rather, disagree on whether those facts establish that Barcus was an independent contractor at the time of his injury. We will review the facts in light of the applicable *Bostic* factors.

**Pertinent Agreements or Contracts**

{¶ 10} On May 21, 2004, Barcus and EGL Eagle Global Logistics, LP ("EGL") executed an agreement entitled "Agreement for Leased Equipment and Independent Contractor Services."   CEVA is the successor in interest to EGL and, as such, assumed

EGL's rights and responsibilities under the agreement. The parties agree that the agreement governs their relationship.

{¶ 11} Under the agreement, Barcus agreed to lease his truck to CEVA and render pick-up and delivery services to facilitate the transportation of shipments of goods. In relevant part, the agreement provided:

> Neither Contractor nor any of its employees or agents shall be considered to be employees of [CEVA] or of [CEVA] customers at any time, under any circumstances, for any purpose whatsoever, and nothing in this Agreement shall be construed as inconsistent with that relationship. Contractor shall exercise independent discretion and judgment to determine the method, manner and means of performance of its contractual obligations under this Agreement. [CEVA] shall, however, issue reasonable and lawful instructions regarding the results to be accomplished by Contractor and failure to accomplish such results shall be considered a breach of this Agreement by Contractor.

(Section I.) Further, the agreement stated:

> Contractor agrees to direct the operation of the Leased Vehicle and to determine the method, manner and means of performing the contractual obligations under this Agreement in all respects including, but not limited to, such matters as the rejection and acceptance of dispatches offered by [CEVA], the days and time Contractor will operate the Leased Vehicle, the routes traveled, parking sites, and the repair of the Leased Vehicle, provided that Contractor shall fully and efficiently perform its obligations under this Agreement.

(Section 2.02.)

{¶ 12} The agreement required contractors to obtain and keep in force occupational accident insurance. Contractors could purchase such insurance through CEVA. Barcus opted for such a policy, and CEVA deducted the cost of the policy from the monies it owed him.

**Details, Quality, and Hours of Work**

{¶ 13} Generally, Barcus performed home deliveries for CEVA. Barcus would report to CEVA's warehouse around 7:00 or 7:30 a.m. to load the freight to be delivered that day. CEVA provided him paperwork that specified the drop-off locations for each

item. Normally, deliveries were assigned a four-hour window, either 8:00 a.m. to noon or 1:00 to 5:00 p.m. Barcus had to deliver the items within the assigned window.

{¶ 14} Barcus had the right to refuse work. Pursuant to the agreement:

> Contractor shall be entitled to decline [CEVA's] request to furnish the Leased Vehicle and labor and to perform such work on any particular occasion without penalty provided that Contractor has not previously advised [CEVA] that he would be available at such time the Leased Vehicle and labor are to be furnished and such work is to be performed.

(Section 2.02.) Despite this provision, Barcus did not feel that he could refuse any work. Barcus believed that CEVA would stop giving him shipping assignments if he declined any jobs.

**Selection of Materials, Tools, and Personnel Used**

{¶ 15} Barcus owned the truck. He bore the responsibility for paying all the expenses arising from the operation, maintenance, and repair of the truck. Barcus also had the obligation to provide the equipment, such as load bars and pallet jacks, necessary for delivering the freight. CEVA required Barcus to purchase a two-way communication device so that CEVA personnel could communicate with him while he was out on deliveries.

{¶ 16} Under the parties' agreement, Barcus could "employ persons to perform, or assist [him] in performing [his] contractual obligations." (Section 2.09.) According to the agreement, if a contractor employed people other than himself, those people would "be Contractor's employees or agents exclusively, and * * * subject solely to Contractor's direction and control including the selection, hiring, firing, supervising, instructing, training, discipline and setting of wages, hours and working conditions." (Section 2.09.)

{¶ 17} In 2007, Barcus formed PKG Trucking LLC. He leased a second truck to CEVA and selected drivers and helpers for both trucks. Barcus paid those drivers and helpers.

{¶ 18} Barcus claims that he never actually hired drivers or helpers because anyone he identified as a potential hire was subject to screening and drug testing by CEVA. If a potential hire did not pass the background check and drug testing, Barcus could not hire that person. Rhonda Bateman, CEVA's director of independent contractor relations, explained that federal regulations require CEVA, as a holder of a motor carrier license, to

qualify potential hires. According to Bateman, Barcus, not CEVA, hired drivers and helpers for his leased trucks, but Barcus could only hire a person if CEVA first determined that the potential hire met the federal standards. The parties' agreement also required that potential hires satisfy the driving requirements of CEVA's public liability insurer.

**Routes**

{¶ 19} CEVA did not specify which streets or highways Barcus was to use to navigate between locations. Barcus, however, contends that CEVA determined the delivery route because "[t]here are only so many ways to get somewhere and the route generally would be determined by the delivery list CEVA provided to me." (Admission No. 13.) To the extent that this contention suggests that the time windows assigned to the deliveries dictated the route, CEVA responds that customers, not CEVA, selected the time windows.

**Length of Employment**

{¶ 20} Barcus began working with CEVA when CEVA overtook EGL's operations in 2005. The term of the parties' agreement is one year. The agreement renews each year unless either party provides a termination notice to the other in writing at least 30 days prior to the expiration of the term.

**Payment**

{¶ 21} CEVA paid Barcus 65 percent of the total amount of the tariff for each shipment Barcus picked up and delivered. CEVA disbursed to Barcus the amounts due every other week.

**Other Factors:  Appearance**

{¶ 22} CEVA required Barcus to purchase a white truck and ordered that the truck bear decals with CEVA's name and logo. CEVA also required that drivers of the leased trucks wear uniforms. Bateman explained that CEVA imposed these requirements to comply with federal regulations.

**Other Factors:  Work for Others**

{¶ 23} Pursuant to the parties' agreement, Barcus had the right to work for other carriers. However, before undertaking any shipping services for other carriers, Barcus had to notify CEVA and cover all CEVA identification on the truck.

{¶ 24} The parties' agreement contains a non-competition clause.  Barcus agreed that, "at no time during the term of this Agreement and for a period of six (6) months following termination of this Agreement," would he "solicit, by-pass, back solicit, or perform any services for compensation for any customer for which [he] performed services during the term of this Agreement."  (Section 6.08.)

**Other Factors:  Taxes**

{¶ 25} Barcus has received a 1099 tax form from CEVA for each year he has provided services to CEVA under the agreement.  Barcus reports on his tax returns that he is self-employed.

{¶ 26} Three of the above factors unequivocally indicate that Barcus was an independent contractor.  First, the parties' agreement designates Barcus an independent contractor and explicitly empowers him to determine the manner and means of doing the work.  Second, Barcus was paid per job and not on an hourly or salary basis.  *See State ex rel. Peyton v. Schumacher*, 10th Dist. No. 00AP-78 (Nov. 16, 2000) (payment of a worker by the ton hauled, rather than an hourly wage or salary, indicated the worker was an independent contractor); *Walker v. Lahoski*, 9th Dist. No. 19293 (July 28, 1999) ("If the worker is paid on an hourly basis, this tends to indicate that the worker was an employee, while payment by the job tends to indicate that the worker was an independent contractor.").  Third, Barcus received 1099 tax forms and reported himself as self-employed.  *See Northeast Ohio College of Massotherapy v. Burek*, 144 Ohio App.3d 196, 203-04 (7th Dist.2001) (the use of a 1099 form "typically suggests that the parties were not acting in an employer/employee relationship but rather in that of an independent contractor relationship").

{¶ 27} Other factors also militate in favor of an independent contractor relationship.  First, Barcus exercised the necessary control over the details and quality of the work, as well as the hours he worked and routes he drove, to justify independent contractor status.  CEVA dictated the result it wanted:  the delivery of items to certain locations within a time window.  Barcus could opt to accept or reject the job, as long as he had not already agreed to be available to provide CEVA with his services.  If Barcus accepted, he determined the sequence of delivery and the routes he would take to accomplish the result sought.

{¶ 28} Barcus protests that he could not decline work without adverse consequences, but the parties' agreement prohibited the imposition of any penalty for refusing work as long as Barcus had not previously agreed to be available for work. Moreover, a decrease in the amount of work assigned is "not the type of control sufficient to overcome the clear intent of [a] contract that [a worker's] status would be that of an independent contractor." *Brown*, 2010-Ohio-4606, at ¶ 22. Furthermore, setting a deadline for the completion of a job, i.e., requiring delivery during a four-hour window, does not show the same level of control as telling a hired person that he must work from this hour to that hour. *Soloman v. Dayton Window & Door Co., L.L.C.*, 196 Ohio App.3d 16, 2011-Ohio-6182, ¶ 16 (2d Dist.). The latter suggests an employer-employee relationship, while the former suggests an independent contractor relationship. *Id.* Finally, even though timing and the finite number of roadways may influence the route taken, Barcus ultimately controlled the path he took to accomplish delivery.

{¶ 29} Second, Barcus selected the tools and personnel used to accomplish deliveries. The requirements of the job necessitated certain equipment, which Barcus provided. Although CEVA required a two-way communication device, Barcus selected the particular device he would use and purchased it himself. Moreover, Barcus determined whether he and/or another driver under his employ would perform deliveries. While CEVA needed to qualify other drivers before Barcus could hire them, the screening process was required by federal regulations and CEVA's public liability insurer. Measures taken to comply with federal regulations do not demonstrate the type of employer control necessary to establish an employment relationship. *Testement v. Natl. Highway Express*, 114 Ohio App.3d 529, 533 (9th Dist.1996). Likewise, an employment relationship is not established by CEVA's "desire to limit its exposure to liability by making sure only responsible and licensed drivers operate its leased property." *Haring v. Triangle Equip. Corp.*, 91 Ohio App.3d 432, 438 (5th Dist.1992).

{¶ 30} Third, Barcus could haul freight for other carriers. *See Ehrhardt v. Chatlain Ents., Inc.*, 5th Dist. No. 10CA123, 2011-Ohio-3223, ¶ 34, 37 (ability to seek hauling jobs from other trucking companies indicated an independent contractor relationship); *Golden v. Kearse*, 12th Dist. No. CA98-08-164 (June 7, 1999) (same). The requirement that Barcus cover the CEVA decals on the truck before driving for others

presented a practical impediment to such work, but Barcus adduced no evidence establishing that covering the decals was impossible. The noncompetition clause precluded Barcus from working for CEVA customers, but this provision appears motivated by CEVA's desire to protect its business, not to curtail its drivers' ability to engage in outside work.

{¶ 31} One factor—the appearance CEVA required of the leased trucks and the drivers—would cut in favor of an employer-employee relationship had CEVA not explained why it requires its name to appear on the leased trucks and drivers' clothing. According to Bateman, CEVA's director of independent contractor relations, federal regulations mandate the decals and uniforms. As we stated above, measures undertaken to comply with federal regulation do not demonstrate the control needed to establish an employer/employee relationship. *Testement* at 533. Furthermore, "as a practical matter, every contract for work reserves to the employer a certain degree of control to enable him to ensure that the contract is performed according to specifications." *Nese*, 2013-Ohio-1777, at ¶ 34. Here, to the extent that CEVA exercised control over appearance, CEVA did so to maintain professional and competitive shipping services.

{¶ 32} Viewing the evidence in its totality, we conclude that reasonable minds could only find that Barcus was an independent contractor at the time of his injury. We thus determine that the trial court did not err in granting CEVA summary judgment.

{¶ 33} For the foregoing reasons, we overrule the assignment of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and HORTON, JJ., concur.

_____