[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Ugicom Ents., Inc. v. Morrison*, Slip Opinion No. 2022-Ohio-1689.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-1689

THE STATE EX REL. UGICOM ENTERPRISES, INC., APPELLANT, *v.* MORRISON, ADMR., BUREAU OF WORKERS' COMPENSATION, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Ugicom Ents., Inc. v. Morrison*, Slip Opinion No. 2022-Ohio-1689.]**

*Workers' compensation—Independent contractors and employees—Right to control manner or means of work—Some-evidence standard—Some evidence supported determination of Bureau of Workers' Compensation that workers were company's employees rather than independent contractors—Court of appeals' judgment affirmed.*

(No. 2021-0674—Submitted January 25, 2022—Decided May 24, 2022.)

APPEAL from the Court of Appeals for Franklin County,

No. 17AP-895, 2021-Ohio-1269.

_____

**Per Curiam.**

**{¶ 1}** The question presented in this appeal is whether some evidence supported the determination of appellee, Sarah Morrison, administrator of the

Bureau of Workers' Compensation, that appellant, Ugicom Enterprises, Inc., an underground-cable-installation provider, had misclassified its workers for workers' compensation purposes as independent contractors rather than as employees. The Tenth District Court of Appeals determined that some evidence supported the bureau's determination that the workers were Ugicom's employees and denied Ugicom's request for a writ of mandamus ordering vacatur of the bureau's decision. We affirm.

## I. BACKGROUND

### A. Ugicom I

{¶ 2} In 2009, the bureau audited Ugicom to ensure that Ugicom had paid the correct amount of workers' compensation premiums for the period of January 1, 2004, through June 30, 2009.[1] Mary Jo Eyink, an auditor with the bureau, conducted the audit. Based on her findings, Eyink determined that Ugicom had exercised "too much control" over workers to whom it had issued Internal Revenue Service ("IRS") Forms 1099, leading the bureau to designate those workers as Ugicom's employees for workers' compensation purposes and resulting in a $346,817.55 invoice to Ugicom for unpaid premiums.[2]

{¶ 3} After unsuccessfully challenging those findings through the bureau's administrative process, Ugicom filed an original action in the Tenth District Court of Appeals, seeking a writ of mandamus ordering vacatur of the bureau's decision that the workers were Ugicom's employees. *See State ex rel. Ugicom Ents., Inc. v. Buehrer*, 10th Dist. Franklin No. 13AP-527, 2014-Ohio-4942, ¶ 1, 7-9 ("*Ugicom I*"). The court of appeals granted the writ on the ground that the bureau had erred

---

1. The bureau later extended the audit period through June 30, 2012, and then again through June 30, 2015. But the bureau stated that its decision concerned only Ugicom's protest against the findings for the initial audit period.

2. "[A] Form 1099 is used by independent contractors to report income to the federal government." *Hopkins v. Duckett*, D.N.J. No. 02-5589, 2006 WL 3373784 (Nov. 21, 2006), fn. 2.

in relying on the 20-factor test under R.C. 4123.01(A)(1)(c) for determining whether a "person who performs labor or services pursuant to a construction contract" is an employee for workers' compensation purposes. *Ugicom I* at ¶ 14, 28. The court of appeals explained that the test was inapplicable because this "case does not concern a construction contract, as that term is defined in R.C. 4123.79(C)(2)." *Id.* at ¶ 14. The court of appeals directed the bureau to issue a new order addressing Ugicom's challenge. *Id.* at ¶ 28.

### B. Ugicom's operations

{¶ 4} In response to *Ugicom I*, the bureau set the matter for a hearing before an adjudicating committee to assess Ugicom's operations under the common-law right-to-control test for determining whether a worker is an employee or an independent contractor. *See* R.C. 4123.291(A) (empowering "[a]n adjudicating committee appointed by the administrator of workers' compensation to hear any matter specified" within the statute). Both Eyink and Fred Kibuuka, Ugicom's vice president, testified at the hearing. Eyink elaborated on her audit findings, and Kibuuka described Ugicom's operations. The audit findings and hearing testimony reflect the following facts about Ugicom's operations.

{¶ 5} Ugicom performs underground-cable installations, mainly in residential areas, as a subcontractor for Time Warner Cable Company ("TWC"). TWC uses its website to dispatch jobs to Ugicom, which Ugicom then retrieves through its web-based system and assigns to cable installers. An installer logs on to the system each morning to obtain the job's details and logs back on in the evening to confirm completion of the job, which generates an invoice from Ugicom to TWC. Ugicom does not require the installer to accept the job assignment. And Ugicom determines the amount that it will pay for a job; the installer does not submit a bid.

{¶ 6} TWC provides a badge to each installer who passes a TWC-coordinated drug test and background check. The badge has an identification

number that is registered with TWC's dispatch department. After receiving clearance from TWC, the installer may begin working for Ugicom. Photographs in the record before us show a work van with a sign on its door that says "Ugicom Enterprises, Inc., Contractor for Time Warner Cable" and a vest worn by an installer that says "Contractor for Time Warner Cable."

{¶ 7} Ugicom requires the installers to sign a one-year independent-contractor agreement and to provide their own liability insurance. The contract contains a noncompete clause that forbids an installer from providing similar services to a competitor of Ugicom while the contract is in force. Either party may terminate the contract with 60 days' written notice. The contract requires the installer to respond to service requests within two hours.

{¶ 8} The installers furnish their own hand tools for the jobs (generally, a shovel and a spade) and provide their own transportation, cell phones, and laptop computers. The cable that the installers bury into the ground is custom to TWC, so the installers must obtain it from TWC.

{¶ 9} The installers are permitted to work any day or time, provided they obtain the customer's consent to be on the customer's property, and they typically complete between six and ten jobs per day. According to Eyink, "[i]t's just a matter of [the installers'] stand[ing] on a spade and lifting up some dirt and going down and lifting up some [more] dirt." Kibuuka noted, however, that the installers also connect the cable to the outside of the home and test its connection.

{¶ 10} The installers are paid by the job and earn on average between $50,000 and $60,000 per year, although some installers make as much as $90,000 per year. According to Eyink's audit notes, Ugicom pays the installers once per month by direct deposit; but at the hearing, Eyink testified that the installers are paid weekly. Taxes are not withheld from the payments to the installers, and no benefits are provided, although sometimes Ugicom will deduct from a payment the costs attributable to damage caused by the installer.

**{¶ 11}** In addition to the installers, Ugicom uses the services of Paul Lule, who performs quality-control checks on 20 percent of the jobs, verifying that the lines were buried correctly. By comparing the income reflected on Lule's Form 1099 for a particular year with that reported to the IRS for the same year, Eyink determined that Lule's sole source of income for the year had been Ugicom.

### C. *The bureau's administrative determinations*

**{¶ 12}** Relying principally on the right-to-control test espoused in *Gillum v. Indus. Comm.*, 141 Ohio St. 373, 48 N.E.2d 234 (1943), and *Bostic v. Connor*, 37 Ohio St.3d 144, 524 N.E.2d 881 (1988), the bureau's adjudicating committee determined that Ugicom had misclassified the installers and Lule as independent contractors. Ugicom then sought review by the administrator's designee. *See* R.C. 4123.291(B) ("An employer who is adversely affected by a decision of an adjudicating committee appointed by the administrator may appeal the decision of the committee to the administrator or the administrator's designee"). Ugicom did not present any new testimony to the administrator's designee, relying instead on the arguments of its counsel. The designee affirmed the adjudicating committee's decision, adopting its statement of facts and legal rationale and "find[ing] that, under the common law test of *Gillum* and *Bostic*, Ugicom exercises control over the workers[,] and * * * the Bureau's auditor's conclusion that the workers are employees [was] correct based on these facts and under the law."

### D. **Ugicom II**

**{¶ 13}** Ugicom then filed an original action in the court of appeals, requesting a writ of mandamus vacating the bureau's decision. 2021-Ohio-1269, ¶ 1 ("*Ugicom II*"). The magistrate recommended denial of the writ, concluding that the bureau did not abuse its discretion in determining that the workers were employees. *Id.* at ¶ 83. The court of appeals overruled Ugicom's objections to the magistrate's decision and adopted it as its own. *Id.* at ¶ 27. This appeal followed.

## II. ANALYSIS

**{¶ 14}** To establish its entitlement to a writ of mandamus, Ugicom must prove (1) a clear legal right to the relief requested, (2) a clear duty on the part of the bureau to provide it, and (3) the lack of an adequate legal remedy in the ordinary course of the law. *See State ex rel. T.S. Trim Industries, Inc. v. Indus. Comm.*, ___ Ohio St.3d ___, 2021-Ohio-2709, ___ N.E.3d ___, ¶ 14. "The [bureau] is the exclusive finder of fact in workers' compensation matters; a court's role in adjudicating a mandamus complaint is to determine whether the [bureau] abused its discretion by entering an order that is not based on some evidence in the record." *State ex rel. Digiacinto v. Indus. Comm.*, 159 Ohio St.3d 346, 2020-Ohio-707, 150 N.E.3d 933, ¶ 13.

**{¶ 15}** "Because an independent contractor is not an employee for purposes of workers' compensation law, the resolution of [the question whether the worker is actually an employee] determines the employer's obligation to contribute to * * * the State Insurance Fund." *Bostic*, 37 Ohio St.3d at 145, 524 N.E.2d 881. The factfinder ordinarily decides this question, and it does so by considering "who had the right to control the manner or means of doing the work." *Id.* at 145-146. This is "the key factual determination." *Id.* at 146.

**{¶ 16}** The right-to-control test is not marked by a bright-line rule but rather a set of nonexhaustive factors. *See Gillum*, 141 Ohio St. at 374-375, 48 N.E.2d 234, quoting 27 American Jurisprudence, Indicia of Relationship, Section 5, at 485 (" 'there is no absolute rule for determining whether one is an independent contractor or an employee' "). In *Gillum*, we set forth the following factors that the decision maker should consider:

> "[T]he existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price, the independent nature of his business or his distinct calling, his employment of assistants

6

with the right to supervise their activities, his obligation to furnish necessary tools, supplies, and materials, his right to control the progress of the work except as to final results, the time for which the workman is employed, the method of payment, whether by time or by job, and whether the work is part of the regular business of the employer."

*Id.* at 375, quoting 27 American Jurisprudence, Section 5, at 485. *See also Bostic* at 146 (explaining that the decision maker should consider "such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts").

### A. The installers

#### 1. Whether the work is part of the regular business of the employer

{¶ 17} The bureau first determined that the cable-installation work rendered by the installers was part of Ugicom's regular business. Notably, Ugicom has not contested that determination. But even if it had, the audit findings established that Ugicom was engaged in the business of installing underground cable for TWC and that the installers performed that work. Some evidence supported the bureau's determination under this factor.

#### 2. Whether the installers are engaged in an independent business

{¶ 18} "[O]f prime importance," *Gillum* at 377, is whether the installers were engaged in an independent business. In determining that the installers were not independent of Ugicom, the bureau pointed to the installers' public image when working. The bureau cited Kibuuka's testimony concerning the badges that the installers wore at the jobsites. An installer wore the badge, Kibuuka explained, because if a problem arose at a jobsite, law enforcement could confirm through

TWC's dispatch department that the installer "work[ed] for Ugicom."  The bureau further pointed to evidence establishing that an installer had posted a sign on his vehicle stating "Ugicom Enterprises, Inc., Contractor for Time Warner Cable."

{¶ 19} In response, Ugicom cites evidence establishing that it was TWC, not Ugicom, that required the installers to wear the badges, that the installers wore reflective vests bearing TWC's name, and that the bureau's Form U-3S provides that coverage is *elective* for a limited liability company acting as a sole proprietor, which apparently is the business structure adopted by some of the installers.  But even if those points tend to detract from the bureau's decision, there is at least some evidence supporting its finding that the installers were not independent of Ugicom. *See State ex rel. Packaging Corp. of Am. v. Indus. Comm.*, 139 Ohio St.3d 591, 2014-Ohio-2871, 13 N.E.3d 1163, ¶ 26 ("it is not an abuse of discretion for the commission to rely on evidence that is contradicted by equally persuasive evidence").

### 3. Method of payment

{¶ 20} The bureau determined that the method by which Ugicom paid the installers further indicated that the installers were not independent contractors.  The bureau focused on the installers' prospect of profits or losses.  When asked how the installers were paid, Kibuuka testified that he would "make up" an amount to pay the installers for each type of service: "So, for instance if Time Warner pays me a hundred dollars to drill a sidewalk, then I will pay my contractor $80 to do that same sidewalk and Ugicom will keep the $20, something like that."  In other words, Ugicom's rate of pay was nonnegotiable, meaning that Ugicom foreclosed the installers from submitting bids.  The bureau reasoned that the installers were distinct from independent contractors in the construction industry who "maintain[] their own separate business [and] take[] into consideration all of their expenses when pricing work in order to make a profit and [are] at risk of a loss."

**{¶ 21}** Ugicom advances several arguments in response. First, it correctly argues that the bureau erred in concluding that the installers' receipt of piece-rate compensation (essentially, payment per job rather than payment per hour) was evidence of an employment relationship. The bureau reached this conclusion because aspects of piece-rate compensation are covered by regulations adopted under the Fair Labor Standards Act, 29 U.S.C. 201 et seq. *See* 29 C.F.R. 778.109 and 778.111. The regulations cited by the bureau do not, however, explicitly account for the common-law right-to-control test. Indeed, as the Eleventh Circuit Court of Appeals concluded in *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 898 F.3d 1110, 1122 (11th Cir.2018), the federal act and the common-law right-to-control test involve different standards for identifying an employment relationship.

**{¶ 22}** Ugicom further faults the bureau's failure to apply the law-of-the-case doctrine, *see Nolan v. Nolan*, 11 Ohio St.3d 1, 3-4, 462 N.E.2d 410 (1984), arguing that both the bureau and the court of appeals in *Ugicom II*, 2014-Ohio-4942, at ¶ 25, failed to honor the *Ugicom I* court's statement that payment per job is indicative of an independent-contractor relationship. But we need not reach Ugicom's law-of-the-case argument, because the bureau's reliance on the regulations was otherwise erroneous.

**{¶ 23}** Ugicom also argues that the installers faced opportunities for profits or losses and had to consider the cost of traveling to a job, the length of time required to complete the job, and the job's complexity. And Ugicom correctly points out that the installers' receipt of Forms 1099 rather than Forms W-2 supports a finding that they were independent contractors. *See Northeast Ohio College of Massotherapy v. Burek*, 144 Ohio App.3d 196, 203-204, 759 N.E.2d 869 (7th Dist.2001) ("The use of [Forms 1099] typically suggests that the parties were not acting in an employer/employee relationship but rather in that of an independent contractor relationship").

**{¶ 24}** Although Ugicom's arguments are not without some force, the narrow question here is whether some evidence supported the bureau's determinations. We conclude that some evidence supported the determinations, namely, the evidence showing Ugicom's exertion of control over the installers through its method of payment. Ugicom's take-it-or-leave-it approach to pricing the jobs, which foreclosed an installer's ability to submit a bid, was a means of controlling the installers.

### 4. Length of employment

**{¶ 25}** The bureau determined that Ugicom had an ongoing relationship with the installers. In support of that finding, the bureau pointed to the "high dollar amounts" reflected on the installers' Forms 1099, which the bureau reasoned was indicative of large volumes of work performed by the installers. The bureau also inferred that the installers were involved in an ongoing relationship with Ugicom because there was no evidence showing that the installers had advertised their services to the community at large.

**{¶ 26}** Ugicom challenges the bureau's determination that Ugicom had an ongoing relationship with the installers, claiming that the bureau cited no legal authority permitting it to consider that factor. It also claims that an "ongoing relationship is not evidence of an employment relationship." Ugicom is wrong on both counts. As the bureau noted in its decision, this court determined in *Bostic* that the "length of employment" is relevant to the analysis, 37 Ohio St.3d at 146, 524 N.E.2d 881. Nor does Ugicom persuasively contest the bureau's rationale regarding the installers' lack of advertising. Ugicom singles out evidence pertaining to Lule's advertising expenses, but we fail to see how this bears on the installers' worker status. Moreover, the most we can find in the record is a bare line item showing that Lule claimed a $20 advertising expense for one tax year.

**{¶ 27}** Ugicom's reliance on *Barcus v. Buehrer*, 10th Dist. Franklin No. 14AP-942, 2015-Ohio-3122, is also unavailing. Ugicom points to arguable

similarities between the contract that it used with its installers and the contract at issue in *Barcus*, highlighting each contract's duration and notice provisions. But although the court of appeals in *Barcus* concluded that the worker in that case was an independent contractor, it did so for reasons unrelated to the contractual provisions to which Ugicom refers. *See id.* at ¶ 26-32.

{¶ 28} In summary, some evidence supported the bureau's determination under this factor.

### 5. Pertinent agreements or contracts

{¶ 29} The bureau pointed to Ugicom's independent-contractor agreement as evidence of Ugicom's efforts to control the installers. Although the agreement labeled an installer as an independent contractor, the bureau determined that the significance of that label was undercut by the agreement's noncompete clause, which provided that an installer "shall not provide during the agreement term services to any competitor of [Ugicom]."

{¶ 30} Ugicom claims that the bureau assigned too much significance to the noncompete clause, arguing that the clause did not restrict an installer from performing work unrelated to Ugicom's services. True, the agreement defined the term "competitor" as a "provider of services similar to those provided by [Ugicom]." But the agreement nevertheless restricted the installers' freedom to work, which evinces a measure of Ugicom's control over the installers.

{¶ 31} Ugicom again invokes *Barcus*, 2015-Ohio-3122, at ¶ 26, claiming that the court of appeals in that case held that an independent-contractor agreement that included a noncompete clause was unequivocal evidence of an independent-contractor relationship. But *Barcus* is silent as to the effect of the noncompete clause in that case. The court of appeals' decision in *Americare Healthcare Servs. v. Akabuaku*, 10th Dist. Franklin No. 10AP-777, 2010-Ohio-5631, which Ugicom also cites, is further afield because it concerned whether a noncompete clause could

be enforced, not whether it was indicative of a particular work relationship, *id.* at ¶ 21.

**{¶ 32}** In summary, the independent-contractor agreement is some evidence of an employment relationship between Ugicom and the installers.

*6. Whether the parties believed they were creating an employment relationship*

**{¶ 33}** In considering this factor, the bureau was unpersuaded by Ugicom's evidence showing that some of the installers thought they were independent contractors. Specifically, the bureau gave no weight to uncontroverted affidavits submitted by two Ugicom installers attesting that they were independent contractors. The bureau reasoned that the substance of the work relationship, rather than its form, was the touchstone for determining the installers' worker status.

**{¶ 34}** Ugicom challenges the bureau's disregard of the affidavits. But we have held that the bureau does not necessarily err when, as here, it disregards an uncontroverted affidavit. *State ex rel. Cherryhill Mgt., Inc. v. Indus. Comm.*, 116 Ohio St.3d 27, 2007-Ohio-5508, 876 N.E.2d 525, ¶ 13 (rejecting the argument that "absent contrary evidence, the commission must accept [the affiant's] affidavit as persuasive").

**{¶ 35}** Ugicom also challenges the bureau's refusal to assign weight to the independent-contractor label that Ugicom gave the installers in the independent-contractor agreement. Although the bureau was perhaps too dismissive of the contract—by suggesting that such a contract may be a "red flag"—the bureau's conclusion that it was not bound by the parties' labels was nevertheless correct, because "a description by the parties of their future relationship is not necessarily determinative when viewed in light of their actual subsequent activities," *N & G Constr., Inc. v. Lindley*, 56 Ohio St.2d 415, 417, 384 N.E.2d 704 (1978), fn. 1 (declining to assign determinative weight to a contract's declaration that the appellant in that case was an independent contractor).

{¶ 36} Mindful that the bureau is the "exclusive finder of fact" with the sole "responsibility to evaluate the weight and credibility of the evidence," *State ex rel. Beyer v. Autoneum N. Am.*, 157 Ohio St.3d 316, 2019-Ohio-3714, 136 N.E.3d 454, ¶ 8, we conclude that the bureau did not abuse its discretion in failing to credit Ugicom's evidence under this factor.

### 7. Tools for the job

{¶ 37} Ugicom challenges the bureau's refusal to give credit to the fact that the installers supplied their own vehicles, gasoline, cell phones, hand tools, and ladders. The bureau declined to accord any weight to that work arrangement because, in its reasoning, it is not uncommon in employment relationships for an employee to supply his own vehicle and tools and to receive mileage reimbursement. But the evidence supporting the bureau's statement in that regard is not apparent in its decision. It follows that the bureau's conclusion under this factor was not supported by some evidence.

### 8. The skill required in the particular occupation

{¶ 38} The bureau determined that minimal skill was required to do the installers' job. Some evidence supported this determination—the bureau quoted in its decision Eyink's statement that the "skill level needed to bury the cable is not high or unique." Ugicom challenges that statement in two ways, but neither is persuasive. First, it points to decisions by other courts determining that cable installers possess specialized skills. *See Santelices v. Cable Wiring and S. Florida Cable Contrs., Inc.*, 147 F.Supp.2d 1313, 1320 (S.D.Fla.2001); *Bennett v. Unitek Global Servs., L.L.C.*, N.D.Ill. No. 10 C 4968, 2013 WL 4804841, *9-10 (Sept. 9, 2013). But the core inquiry here concerns the facts, and the facts presented in other decisions may not substitute for those in this case. Second, Ugicom argues that in addition to burying the cable, the installers connected the cable to the connection box on the home and used a meter to ensure that the connection was successful.

But Ugicom does not develop a fact-based argument to show that these other tasks required specialized skills.

**{¶ 39}** It suffices for the purposes of our review that the bureau's determination under this factor was supported by some evidence.

### 9. *Details and quality of the work*

**{¶ 40}** In considering this factor, the bureau assigned weight to Ugicom's reliance on a quality-control inspector to ensure that the installers were doing their jobs correctly. But Ugicom correctly points out that the inspector's purpose was to ensure that the installers were doing their jobs according to the standards prescribed by TWC, not Ugicom. And even if Ugicom had prescribed the standards, a contract provision stating that a job shall be performed subject to the " 'approval or satisfaction of the employer * * * is not an assumption by the employer of the right to control the person employed as to the details or method of doing the work, but is only a provision that the employer may see that the contract is carried out according to the plans.' " *Gillum*, 141 Ohio St. at 382, 48 N.E.2d 234, quoting 27 American Jurisprudence, Section 7, at 488. The bureau also found it significant that TWC would fine Ugicom for substandard work. But that is a mark of TWC's control over Ugicom, not Ugicom's control over the installers.

**{¶ 41}** Ugicom next challenges the bureau's finding that "[the installers' work] is not the type of work where a supervisor must tell the worker where to dig a trench for each job order." Ugicom correctly exposes a flaw in the bureau's reasoning—in *Gillum*, this court recognized that a lack of supervision is indicative of a lack of control, *id.* at 381. Nor is it clear that there was some evidence to support the bureau's statement that the installers' decisions about where and how to bury a cable "are the same decisions made by competent employees."

**{¶ 42}** Ugicom correctly notes that it did not impose work requirements on the installers akin to those of employees. First, rather than requiring the installers to work from, say, 8:00 a.m. to 5:00 p.m., the installers needed only to respond to

service requests within two hours. This arrangement is not the same level of control as "[t]elling a hired person that he must work from this hour to this hour * * *, which suggests that the person is an employee." *Soloman v. Dayton Window & Door Co., L.L.C.*, 196 Ohio App.3d 16, 2011-Ohio-6182, 961 N.E.2d 1229, ¶ 16 (2d Dist.). Second, as noted above, the installers were free to accept or reject the jobs posted to Ugicom's website. Neither of these facets of the work relationship reflect Ugicom's control over the installers.[3]

{¶ 43} In summary, the bureau's finding under this factor was not supported by some evidence.

### 10. The bureau's ultimate conclusion

{¶ 44} Although the evidence presented to the bureau concerning the installers' worker status points in both directions, we are not called upon to reweigh it here; rather, our function is to determine whether the bureau abused its discretion by entering an order that is not based on some evidence in the record. *See Digiacinto*, 159 Ohio St.3d 346, 2020-Ohio-707, 150 N.E.3d 933, at ¶ 13. Applying that standard, we conclude that the bureau did not abuse its discretion in determining that the installers were Ugicom's employees, because most (though not all) of the bureau's conclusions under the factors were rooted in some evidence in the record.

### B. The quality-control worker

{¶ 45} The bureau determined that Lule, who performed quality-control services for Ugicom, was Ugicom's employee. In reaching that conclusion, the bureau relied on testimony from Eyink, who deduced that Ugicom had been Lule's sole source of income for a period. In the bureau's view, Lule's financial

---

3. Ugicom argues that the installers' freedom to accept or reject a job, which entails their decisions whether they want to travel to a particular jobsite, may also be analyzed under the who-selects-the-routes-traveled factor set forth in *Bostic*, 37 Ohio St.3d at 146, 524 N.E.2d 881. Although the bureau did not consider this factor, Ugicom has persuasively established that the bureau conducted a flawed analysis under the details-and-quality-of-the-work factor.

dependence on Ugicom was evidence that he was not engaged in a business independent of Ugicom.

{¶ 46} Ugicom contends that Lule worked as an independent contractor, noting that he held himself out to the IRS as self-employed and maintained his own workers' compensation policy.[4]  We reiterate what we have said before: our role here is not to reweigh the evidence.  *See State ex rel. Turner Constr. Co. of Ohio v. Indus. Comm.*, 142 Ohio St.3d 310, 2015-Ohio-1202, 29 N.E.3d 969, ¶ 12.  Even if some of the evidence tends to detract from the bureau's decision, that is not enough to establish that the bureau abused its discretion.  *See Packaging Corp. of Am.*, 139 Ohio St.3d 591, 2014-Ohio-2871, 13 N.E.3d 1163, at ¶ 26.  It suffices for the purposes of our review that some evidence supported the bureau's determination that Lule was Ugicom's employee.

### C.  The **Barcus** *decision*

{¶ 47} Contrary to what Ugicom suggests, our decision upholding the bureau's decision will not create any tension with *Barcus*, 2015-Ohio-3122.  As the court of appeals aptly explained below, the scope of review in *Barcus* differed markedly from that required here.  *See Ugicom II*, 2021-Ohio-1269, at ¶ 25.  *Barcus* involved a worker's appeal of a trial court's grant of summary judgment to the worker's purported employer, which the court of appeals then reviewed de novo, determining that the worker was an independent contractor.  *Barcus* at ¶ 1-5, 32; *Ugicom II* at ¶ 25, citing *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 29 ("Because this case was originally decided on summary judgment, our review is de novo").  It follows that because the court in *Barcus* was not bound by the some-evidence standard, that case does not furnish a helpful guide to our application of that standard here.

---

4.  Ugicom intersperses its discussion of Lule with several references to an entity known as Jotin Enterprises, L.L.C.  The bureau, however, made no findings as to Jotin.

## III. CONCLUSION

{¶ 48} We affirm the judgment of the court of appeals.

Judgment affirmed.

O'CONNOR, C.J., and FISCHER, DONNELLY, STEWART, and BRUNNER, JJ., concur.

KENNEDY, J., dissents, with an opinion joined by DEWINE, J.

_____

**KENNEDY, J., dissenting.**

{¶ 49} I dissent from the majority's affirmance of the decision of the Tenth District Court of Appeals that there was some evidence supporting the determination of appellee, Sarah Morrison, administrator of the Bureau of Workers' Compensation, in this case. The bureau determined that cable installers who appellant, Ugicom Enterprises, Inc., had characterized as independent contractors were Ugicom's employees for purposes of Ohio's workers' compensation program. Because there was no evidence supporting its decision, I would hold that the bureau abused its discretion and reverse the judgment of the court of appeals.

### Standard of review

{¶ 50} The issue before us is whether the evidence that the bureau relied on to determine that the cable installers were Ugicom's employees for purposes of the workers' compensation program was sufficient to be deemed "some evidence." *See State ex rel. Digiacinto v. Indus. Comm.*, 159 Ohio St.3d 346, 2020-Ohio-707, 150 N.E.3d 933, ¶ 13. This court does not conduct de novo evidentiary review of a decision of the bureau in a mandamus action, and we do not substitute our judgment of the facts for that of the bureau. *See State ex rel. Pass v. C.S.T. Extraction Co.*, 74 Ohio St.3d 373, 376, 658 N.E.2d 1055 (1996). However, this court does not hesitate to reverse a decision of the bureau when its classification of a worker was arbitrary, capricious, or discriminatory, i.e., an abuse of discretion. *See State ex*

*rel. Progressive Sweeping Contrs., Inc. v. Bur. of Workers' Comp.*, 68 Ohio St.3d 393, 396, 627 N.E.2d 550 (1994).

**Employee v. independent contractor**

**{¶ 51}** "The chief test in determining whether one is an employee or an independent contractor is the right to control the manner or means of performing the work." *Bobik v. Indus. Comm.*, 146 Ohio St. 187, 64 N.E.2d 829 (1946), paragraph one of the syllabus. If the employer reserves the right to control the manner or means of doing the work, as well as the result, then an employer-employee relationship is created. *State ex rel. Nese v. State Teachers Retirement Bd.*, 136 Ohio St.3d 103, 2013-Ohio-1777, 991 N.E.2d 218, ¶ 33-34. On the other hand, if the employer specifies only the result of the work and the worker determines the manner or means of doing the work, then an independent-contractor relationship is created. *Id.* Control over the manner or means of the work exists on a continuum on which the statuses of "employee" and "independent contractor" are separated. *Id*. at ¶ 34.

**{¶ 52}** In *Gillum v. Indus. Comm.*, 141 Ohio St. 373, 374-375, 48 N.E.2d 234 (1943), this court recognized commonly accepted factors for identifying an independent-contractor relationship. But we noted that the " 'presence of one or more of such indicia in a case is not necessarily conclusive.' " *Id.* at 375, quoting 27 American Jurisprudence, Section 5, at 485. Some of the factors cited in *Gillum* were " 'the independent nature of [the worker's] business or his distinct calling, * * * his obligation to furnish necessary tools, supplies, and materials, his right to control the progress of the work except as to final results, the time for which the workman is employed, the method of payment, * * * and whether the work is part of the regular business of the employer.' " *Id.*, quoting 27 American Jurisprudence at 485. But this court in *Gillum* stated that the decisive question is " 'who has the right to direct what shall be done, and when and how it shall be done.' " *Id*., quoting 27 American Jurisprudence at 485.

**{¶ 53}** In *Bostic v. Connor*, 37 Ohio St.3d 144, 146, 524 N.E.2d 881 (1988), citing *Gillum* and other authority, this court set forth elements to consider when determining who has the right to control the manner or means of performing work:

> The factors to be considered include, but are certainly not limited to, such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts.

### The Ugicom model

**{¶ 54}** Ugicom is largely a labor-management company that posts jobs for the installation of underground-cable lines for Time Warner Cable Company. Ugicom contracts with installers who install the cable lines. Ugicom considers the installers to be independent contractors.

**{¶ 55}** Time Warner contracted with Ugicom for the installation of its cable lines. The installation of the cable lines consists of running the lines underground from Time Warner's main line to the cable box on the exterior of the customer's home or business. Time Warner required the Ugicom-affiliated installers to follow certain contractual protocols. Those obligations existed irrespective of the work relationship between Ugicom and the installers. For instance, Time Warner required the installers to submit to a drug test and to wear a badge with an identification number. Time Warner imposed fines on installers for losing their badges.

**{¶ 56}** Time Warner also established standards for how the finished installation should look. All the cable materials for the jobs are provided by Time Warner because they are customized for Time Warner, and the installers pick up

those materials from a Time Warner warehouse. All these requirements are part of the nature of doing business with Time Warner and of doing the installation work.

**{¶ 57}** All of Time Warner's requirements are separate from Ugicom's requirements for the installers. Each installer enters a written contract with Ugicom. The contract requires the installer to maintain workers' compensation insurance and liability insurance, as the installer is solely responsible for any damage that the installer causes in completing a Time Warner work order. Each year, an installer receives from Ugicom an Internal Revenue Service ("IRS") Form 1099. The installers are not W-2 employees, and Ugicom does not withhold from the installers' payments any local, state, or federal taxes. Ugicom does not offer life- or health-insurance benefits to the installers. All written contracts with the installers contain a noncompete clause that states: "Contractor shall not provide during the agreement term services to any competitor of [Ugicom]."

**{¶ 58}** As for the work itself, Time Warner alerts Ugicom to installation jobs that are available in Ugicom's geographic area under the contract. Ugicom then posts those jobs on its web-based system. Installers may sign up to perform a posted job, and if they take a job, the job must be completed within a two-hour time frame. Ugicom does not assign any particular installer to any particular job, and an installer does not have to accept any particular job. There are no set work hours. The installers provide their own transportation, cell phones, laptop computers, and tools to complete the work. The installers may also reject any work order or leave a jobsite if they are unable to complete it. The installers may contact Time Warner's customers to schedule installation appointments.

**{¶ 59}** After an installation is complete, the installer records the job as having been completed on Ugicom's web-based system. Ugicom sets the installers' pay based on what Time Warner is willing to pay for the service. The installers are paid weekly. And Ugicom performs quality-control checks on 20 percent of the jobs to verify that the lines were buried correctly.

**The bureau abused its discretion**

{¶ 60} The majority affirms the appellate court's judgment, finding that some evidence supported the bureau's decision. I disagree. There is no evidence supporting the bureau's decision.

{¶ 61} The decisions prompting this court's review of the bureau's determination start with the decision of the bureau's adjudicating committee that Ugicom had misclassified the installers as independent contractors. Ugicom sought review of the committee's decision by the administrator's designee. *See* R.C. 4123.291(B). The designee affirmed the adjudicating committee's decision, adopting its statement of facts and legal rationale and "find[ing] that, under the common law test of *Gillum* and *Bostic*, Ugicom exercises control over the workers, and * * * the Bureau's auditor's conclusion that the workers are employees [was] correct based on these facts and under the law." This court must now determine whether that decision was supported by some evidence. In my view, the bureau's decision was not based on some evidence.

{¶ 62} Although the bureau did not organize its decision according to the factors from *Gillum* and *Bostic*, the majority opinion distills those factors, so I follow suit below.

*Whether the work is part of the regular business of the employer*

{¶ 63} Ugicom and the installers both work in the broad industry of underground-cable installation. The work at the cable-installation jobsites is *related* to the regular business of Ugicom, but Ugicom is a labor-management company that is in the business of posting available underground-cable-installation jobs. The installers are involved in only the manual labor of installing the underground-cable lines.

{¶ 64} The bureau pointed to the installers' practice of wearing badges identifying them as being affiliated with Ugicom and Time Warner. But that is a jobsite requirement of Time Warner, not Ugicom. The installers work at jobsites

under certain minimum-identification rules. That is public relations, not control over how the installers' work is done. There is no evidence of an independent-contractor relationship under this factor.

*Whether the installers are engaged in an independent business*

**{¶ 65}** The installers are independent workers who perform services for Time Warner. They may take on as much work as they want or as little as they want. The public image that the installers project—which involves wearing a Time Warner badge and having a Time Warner placard on their vehicles—exists to satisfy the contractual requirements between Time Warner and Ugicom. Many of the installers involved in this case had formed their own limited liability companies to take on the work. The installers were responsible for reporting their income for taxes purposes, for paying for their health insurance and life insurance, and for paying to have their mistakes remediated. Their income was reported to the IRS through Forms 1099 rather than Forms W-2. There is no umbrella administrative structure that Ugicom provides to the installers; the installers operate independently of Ugicom, except for receiving job referrals through postings on Ugicom's web-based system. There is no evidence that supports the conclusion that the installers were Ugicom's employees under this factor.

*Method of payment*

**{¶ 66}** The installers are paid by the job, with the rate being determined by the market; that is, the rate is based on how valuable Time Warner believes a particular service is. Based on that amount, Ugicom determines how much it will pay an installer. As the majority acknowledges, the bureau incorrectly relied on the installers' receipt of piece-rate compensation (i.e., payment per job) as being "a clear indicator of employment as it is regulated by the Fair Labor Standards Act [, 29 U.S.C. 201 et seq]." But the majority clings to the payment structure for Time Warner's jobs and says it is evidence of Ugicom's control. The majority states that Ugicom's take-it-or-leave it approach to pricing was a means of controlling the

installers. But the majority fails to consider that because the installers were independent contractors, they could easily "leave it." The installers' ability to decline jobs is a powerful indicator of a lack of control by Ugicom. There is no evidence to support the bureau's decision under this factor.

*Length of employment*

**{¶ 67}** The bureau found that "[t]he ongoing relationship the workers have with Ugicom is a straightforward indicia of employment because the relationship contemplates continuing or recurring work." But the bureau cited no law supporting that assertion, nor did it cite any authority supporting the proposition that an independent-contractor relationship cannot last for years.

*Pertinent agreements or contracts*

**{¶ 68}** The bureau disregarded the plain language of the contracts between Ugicom and the installers. The contract involved here is titled "Unicom Enterprises Independent Contractor Agreement" and contains plain language establishing an independent-contractor relationship:

> Whereas the Company desires [to] retain the services of the Independent Contractor to install Cable technology in the Company's area of business operations the Independent Contractor represents itself as competent and qualified to accomplish the specific requirements of this contract to the satisfaction of the Company therefore this contract is entered into under the following terms and conditions.

**{¶ 69}** But the bureau used the contract, which refers to the installers as independent contractors, as evidence that the installers were *not* independent contractors, calling the agreement "a red flag to look closely at the true nature of the relationship." That erroneous conclusion is discussed more fully below in the

section addressing nonevidence relied on by the bureau. But for purposes of the *Gillum* and *Bostic* factors, the terms of the contract can only be taken as evidence of an independent-contractor relationship. The contract's terms involve the reporting of payments using a Form 1099 rather than a Form W-2 and the installers' responsibility for their own liability, health, and workers' compensation coverages. And as discussed below, the inclusion of a noncompete clause in a contract is not an impediment to an independent-contractor relationship—such a term may be part of an independent-contractor relationship.

{¶ 70} Finally, the bureau attempted to diminish the affidavits of two installers who testified about their independent-contractor relationship with Ugicom. The bureau said that that "meeting of the minds" did not control and opined that Ugicom merely required "an 'independent contractor' agreement to be executed in order [for an installer] to obtain work." But such an agreement is in the very nature of an independent-contractor relationship.

{¶ 71} Regarding this factor, the bureau tried to diminish the fact that the contracts between the installers and Ugicom were indicia of an independent-contractor relationship. The contracts are evidence of *only* an independent-contractor relationship.

*Whether the parties believed they were creating an employment relationship*

{¶ 72} Again, two installers submitted affidavits referring to their contracts with Ugicom and stating that they considered themselves to be independent contractors. This was the only evidence before the bureau on this factor, so no evidence could support the bureau's determination under the factor.

*Tools for the job*

{¶ 73} The bureau gave Ugicom no credit for the fact that the installers provided their own transportation and used their own tools, cell phones, and laptop computers. Despite the fact that a worker's use of his or her own tools is a factor weighing in favor of finding an independent-contractor relationship, the bureau

refused to accord appropriate weight under this factor. But it remains that there was no evidence supporting the bureau's determination under this factor.

*The skills required in the particular occupation*

{¶ 74} The bureau's auditor essentially said that the installers merely turn dirt over with a shovel. But the installers also connect cable to the customers' homes or other buildings, design the pathway that the cable will take, dig under sidewalks and garden areas, check the connection for a signal to ensure that the installation was successful, and interact with Time Warner's customers for scheduling purposes. And they do all of this with speed. The skill displayed by the installers under this factor must be considered in favor of finding an independent-contractor relationship; it is not an indicator that Ugicom controlled the manner or means of the work.

*Details and quality of the work*

{¶ 75} Overall, there is a lack of supervision by Ugicom over the work performed by the installers. The installers' work hours are up to the installers—all that is necessary is that the Time Warner customer be amenable to the hours suggested by the installer for the installation. The installer's efficiency determines how much the installer will be paid over the course of a year. There is no evidence under this factor that indicates control by Ugicom.

*Nonevidence that the bureau relied on*

{¶ 76} There is no evidence that Ugicom, rather than the installers, controlled the manner or means of the installation work. Ugicom merely posts available work on its web-based system, and the installers take it from there. Ugicom does inspect 20 percent of the jobsites for quality-control purposes, but that process does not amount to control of the manner or means of the installers' work. " 'Such a provision is not an assumption by the employer of the right to control the person employed as to the details or method of doing the work, but is only a provision that the employer may see that the contract is carried out according

to the plans.' " *Gillum*, 141 Ohio St. at 382-383, 48 N.E.2d 234, quoting 27 American Jurisprudence, Section 7, at 488.

{¶ 77} What is most concerning about the bureau's decision is that it was largely based on the bureau's nonevidentiary suppositions and generalizations unrelated to the actual facts of this case. For instance, the bureau based its decision, in part, on the following statement: "In many situations, the fact that an employer uses a document called an 'independent contractor' agreement to characterize the relationship, rather than a contract for the performance of a certain piece or kind of work, is a red flag to look closely at the true nature of the relationship." It may be true that there have been cases in which the bureau found an employer-employee relationship when the employer and the employee had an "independent contractor" agreement, but those instances are not evidence that such an agreement amounts to one party's control over the manner or means of the work performed by the other party. Even if the bureau believes that such agreements are a "red flag," a red flag is only an indication that a situation should be looked at more deeply—and there is nothing in the "true nature of the relationship" here that indicates that Ugicom controlled the manner or means of the installers' work.

{¶ 78} Similarly, to support its decision, the bureau used its general impressions, which are not rooted in the law, of how an independent contractor should behave. The bureau stated, "The Ugicom workers are not bidding on work like an independent contractor in the construction industry would bid on work. In the construction industry, a person maintaining their own separate business takes into consideration all of their expenses when pricing work in order to make a profit and is at risk of a loss." But how independent contractors in the construction industry go about their work does not inform the question whether it was Ugicom or the installers who controlled the manner or means of installing the underground-cable lines. The question in this case is who controlled or had the right to control the manner or means of how the installers performed their work. The bureau's

26

overreaching statement about contractors in the construction industry is not some evidence.

**{¶ 79}** Further, the bureau stated that "[a] true independent contractor typically advertises and offers their services to the community at large." But the bureau's statement concerning how independent contractors typically advertise their services has no basis in law and is at best anecdotal. It is not some evidence that the installers in this case were Ugicom's employees.

**{¶ 80}** The bureau also relied on its nonevidentiary opinion about the noncompete clause in the written contracts between Ugicom and the installers. The bureau stated, "This control can be proper in certain employment relationships, but is not a provision used in independent contractor relationships." But that conclusion is contrary to caselaw. In *Barcus v. Buehrer*, 10th Dist. Franklin No. 14AP-942, 2015-Ohio-3122, the court of appeals determined that the truck driver involved in that case was an independent contractor, even though the contract between him and the transportation company that was alleged to have been his employer included a noncompete clause. The court stated that "[t]he noncompetition clause precluded [the truck driver] from working for [the transportation company's] customers, but this provision appear[ed] motivated by [the company's] desire to protect its business, not to curtail its drivers' ability to engage in outside work." *Id.* at ¶ 30.

**{¶ 81}** The same conclusion can be drawn in this case: Ugicom maintains its relationship with Time Warner by not allowing its subcontractors to work for other cable companies. Regardless, the salient point under *Barcus* is that noncompete agreements are used by companies and their independent subcontractors, despite the bureau's broad claim to the contrary. Further, in *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos*., 86 Ohio St.3d 270, 274-275, 714 N.E.2d 898 (1999), this court held that a noncompete clause between Nationwide Insurance Companies and its independent-contractor agent was valid and

enforceable. And in *Americare Healthcare Servs. v. Akabuaku*, 10th Dist. Franklin No. 10AP-777, 2010-Ohio-5631, ¶ 21, the court of appeals held that the enforceability of a noncompete clause does not depend on the status of a party to the contract as an employee or an independent contractor.

{¶ 82} The bureau adopted a smell test rather than applying a test requiring review of the actual evidence. The bureau started from its conclusion and then attempted to force factors that supported Ugicom's claim that the installers were independent contractors to instead support its notion that they were not. The bureau stated that "Ugicom is on the more sophisticated end of employers that have misclassified the labor for its business operation." In conducting its analysis that way, the bureau was able to take evidence proving that the installers were independent contractors and flip it.

{¶ 83} For instance, the bureau took the facts that many of the installers had formed their own limited liability companies or had obtained their own workers' compensation coverage as evidence that they were *not* independent contractors: "Ugicom apparently requires the workers to either form an LLC or take out workers' compensation coverage. The fact that a worker paid the filing fee to form an LLC does not mean the worker is actually in business for themselves. Employers that misclassify employees sometimes require the worker to form an LLC before they 'hire' the worker as an 'independent contractor.' " Rather than correctly considering this evidence in Ugicom's favor, the bureau characterized it as things that a company does to disclaim the necessity of participation in the workers' compensation program. In my view, this indicates that the bureau made its decision without considering the evidence.

{¶ 84} Lastly, the bureau criticized Ugicom for attempting to make its case by concentrating on the right-to-control factors. Instead of addressing Ugicom's arguments, the bureau opined that the arguments were typical of an employer who is trying to disclaim an employer-employee relationship:

When an employer points to "right to control" factors, the workers are usually not performing services in an independent business, trade or profession. Ugicom's position is typical of an employer attempting to justify why they classified the labor for their business operation as "independent contractors." The employer ignores that the independent business or occupation of the worker is of "prime importance," while placing great weight on certain factors in the "right to control" test when the facts do not support [that] the individual is in business for himself in the place. That is the case here.

{¶ 85} The actions of parties not involved in this case are not evidence in this case, nor are the bureau's assumptions or insinuations.

*The* Gillum *and* Bostic *factors support a determination that Ugicom's installers were independent contractors*

{¶ 86} In applying the *Gillum* and *Bostic* factors to determine who had the right to control the manner or means of the work, it is important to not miss the forest for the trees. This court in *Gillum* stated that the decisive question is " 'who has the right to direct what shall be done, and when and how it shall be done.' " *Gillum*, 141 Ohio St. at 375, 48 N.E.2d 234, *Id.*, quoting 27 American Jurisprudence at 485. Likewise, the factors set forth in *Bostic*, 37 Ohio St.3d at 146, 524 N.E.2d 881, are designed to determine who has the right to control the manner or means of performing work.

{¶ 87} Ugicom is essentially a labor-management company serving as a referral service for underground-cable-installation jobs for its customer, Time Warner. The only thing that it controls is how the installers get paid. It informs installers about available work, but the installers control the manner or means of

the work performed. The installers undertake jobs at their own discretion. They provide their own tools, technology, and transportation. They are not W-2 employees, and many of them have formed limited liability companies to do the work. They are responsible for any damage that they cause to the customers' property and, to that end, they carry their own liability insurance and are responsible for their own workers' compensation coverage. They are parties to a contract that declares that they are independent contractors, and two installers testified before the bureau that they were independent contractors. They know what a finished installation is supposed to look like based on instruction by Time Warner, not Ugicom. But no one tells them how to do their jobs. They are involved in a niche industry that has a narrow customer base. And they control the manner and means of doing their work.

*The weakness of the majority opinion*

**{¶ 88}** The flaw in the majority opinion is its fealty to the decision of the bureau. Because the majority defends the bureau's decision, it is forced to ignore the obvious facts in the record in order for it to look for some evidence in the space between the bureau's untethered decision and the caselaw. The bureau jumped to a quick conclusion, claiming to have determined Ugicom's true motives:

> Ugicom simply called its workers 'independent contractors' to evade the obligations associated with having employees. The workers are vetted by [Time Warner] and given identification badges that lets customers of [Time Warner] know that Ugicom, a contractor for [Time Warner], is on their property performing the work. [Time Warner] pays Ugicom for the service performed and Ugicom in turns pays the workers for their labor. The workers are not contracting with Ugicom to provide a specialized service that is not a part of the regular business of Ugicom.

**{¶ 89}** The some-evidence rule presents a playing field that is tilted toward the bureau, but the bureau must still supports its conclusions with relevant and probative evidence. The majority here has not identified any evidence that supports its conclusion that Ugicom has the right to control the manner or means of the installers' work. The contractual terms between Time Warner and Ugicom and the suppositions and generalizations of the bureau that are unrelated to the facts of this case cannot serve as "some evidence" to support the bureau's decision.

### Conclusion

**{¶ 90}** Because there was no evidence supporting the bureau's conclusion that Ugicom controlled the manner or means of the work performed by the underground-cable installers, the bureau abused its discretion in determining otherwise. Accordingly, I would reverse the judgment of the court of appeals. Because the majority holds that some evidence supported the bureau's decision, I dissent.

DEWINE, J., concurs in the foregoing opinion.

––––––––––––––––––

Zashin & Rich Co., L.P.A., and Scott Coghlan, for appellant.

Dave Yost, Attorney General, and Jacquelyn McTigue, Assistant Attorney General, for appellee.

––––––––––––––––––