[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Friendship Supported Living, Inc. v. Ohio Bur. of Workers' Comp.*, Slip Opinion No. 2023-Ohio-957.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2023-OHIO-957

THE STATE EX REL. FRIENDSHIP SUPPORTED LIVING, INC., APPELLEE, *v*. OHIO BUREAU OF WORKERS' COMPENSATION, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Friendship Supported Living, Inc. v. Ohio Bur. of Workers' Comp.*, Slip Opinion No. 2023-Ohio-957.]

*Workers' compensation—Premium audit—Employment relationship—Factors for determining whether a person is an independent contractor or employee for workers' compensation purposes—Right-to-control test—Court of appeals' judgment reversed—Limited writ granted ordering Bureau of Workers' Compensation to issue an amended order that accounts for the factors being considered by furnishing reasons that are briefly explained and statements that are fact-specific.*

(No. 2022-0142—Submitted January 10, 2023—Decided March 28, 2023.)

APPEAL from the Court of Appeals for Franklin County, No. 19AP-882, 2021-Ohio-4490.

_____

**Per Curiam.**

{¶ 1} Appellant, the Ohio Bureau of Workers' Compensation, appeals the Tenth District Court of Appeals' decision determining that the bureau abused its discretion by issuing an order classifying the in-home direct-care workers of appellee, Friendship Supported Living, Inc., as employees rather than independent contractors. The court of appeals granted a writ of mandamus ordering the bureau to vacate its order and return to Friendship any premiums imposed or received as a result of that order. We conclude that the bureau abused its discretion in adopting its order by failing to sufficiently account for the relevant factors bearing on the work relationship between Friendship and its direct-care workers. We accordingly reverse the court of appeals' judgment and grant a limited writ of mandamus directing the bureau to issue an amended order.

## I. BACKGROUND

### A. *Friendship's operations*

{¶ 2} Friendship provides in-home direct-care services to developmentally disabled persons known as "consumers" under a program administered by the Ohio Department of Developmental Disabilities ("DDD"). The services are provided according to "individual service plan[s]" that prescribe the duration and frequency of the services to be provided to each consumer. At issue here is Friendship's classification of the workers that it assigns to provide these in-home direct-care services as independent contractors.

{¶ 3} The workers' classification has been evaluated at least twice previously. In a 2008 premium audit, the bureau determined that these workers were independent contractors. And in reviewing a determination by the Unemployment Compensation Review Commission ("UCRC") in 2016, the Franklin County Court of Common Pleas determined that one of these workers was an independent contractor. *See Friendship Supported Living, Inc. v. Dir., Ohio Dept. of Job & Family Servs.*, Franklin C.P. No. 15CVF-8721 (Mar. 7, 2016). The

bureau's final order also refers to a 2006 premium audit. But the record before us does not include an audit report from 2006.

{¶ 4} This case involves the bureau's 2017 premium audit of Friendship for the period July 1, 2014, to June 30, 2015. Based on information supplied during the audit by Florence Hein, Friendship's owner, the bureau's auditor determined that the direct-care workers are employees, not independent contractors. The auditor reported the following findings:

> [The workers are] [p]aid hourly;
>
> The [Internal Revenue Service ("IRS") Form] W-2 staff also visits the same clients as the contractors to perform other related services * * *;
>
> Typically, the workers are interviewed, hired and paid set wages;
>
> They have their work assigned and scheduled (i.e., they are expected to be [at] the client's between specific hours);
>
> The home health worker does not make decisions about the care or medication, exercise, etc.; they follow a plan developed by a healthcare provider and are overseen by a case manager or RN;
>
> The contract states that after 24 months they can apply to be an employee of [F]riendship;
>
> Industry standards have some supervisor [sic] of the work that is performed by the home health aides [("HHA")];
>
> The contractors do not call to schedule any visits to the clients they serve. The company performs all scheduling of days and times when the contractor is to work;
>
> Worker's activities are monitored for compliance and quality;

A worker could not hire someone to fill in—the services have to be performed by him/her personally;

Timesheets are submitted and [IRS Form] 1099 recipients do not invoice for their services. They are paid hourly, not by visit;

The HHA cannot contract to another party to provide the services—he/she must perform the services personally;

Liability insurance is carried by the employer; [and]

Services are integrated into the functioning of the employer who is in the business to provide home health[care] * * *.

{¶ 5} Friendship protested the audit findings and requested a hearing before the bureau's adjudicating committee. *See* R.C. 4123.291(A) and (B)(5) (empowering an adjudicating committee to hear an employer's protest relating to an audit finding). Friendship supported its protest with records, including a transcript of Hein's testimony from the 2015 UCRC hearing and an affidavit from Hein attesting that her UCRC testimony "is still a truthful and accurate statement of Friendship Supported Living's business and relationship with the direct care providers."

{¶ 6} In her UCRC testimony, Hein stated that Friendship pays the direct-care workers an hourly rate based on their submission of invoices for hours worked and that Friendship provides the workers with Form 1099, but she testified that Friendship does not train or supervise the workers. The workers choose how frequently they are paid (i.e., weekly or biweekly), and they sign contracts with Friendship designating them as "independent contractors." Friendship assigns the direct-care workers to a consumer, but the workers can decline the assignment and, within limits, "decide from day to day when they * * * work with their assigned [consumer]." They "work[] off of the [individual service] plan and [do] the day to day operations of that plan" but are unsupervised in this work. If a consumer has a

4

concern about one of the direct-care workers, the consumer reports the concern to a Friendship employee or to Hein rather than to the direct-care worker. Hein testified that unlike the direct-care workers that are considered subcontractors, Friendship's employees are on-call and that they do things for the consumers such as attend medical appointments and coordinate medications, check their homes for safety, and provide them with skills training (e.g., riding the bus) as required by the individual service plans.

{¶ 7} Hein testified that the state also provides in-home direct-care services to consumers and that the state classifies its workers who provide these services as "independent contractors." Friendship permits its direct-care workers to work for its competitors, including for the state, but it forbids them from subcontracting their consumer assignment to someone else. And Friendship does not reimburse the workers for expenses except for certain mileage expenses.

*B. Procedural history*

{¶ 8} The adjudicating committee denied Friendship's audit protest, determining that Friendship's in-home direct-care workers are employees rather than independent contractors. Citing *Gillum v. Indus. Comm.*, 141 Ohio St. 373, 48 N.E.2d 234 (1943), and *Bostic v. Connor*, 37 Ohio St.3d 144, 524 N.E.2d 881 (1988), the committee determined that Friendship has the right to control the workers. The committee further determined that neither of the bureau's earlier audits from 2006 and 2008 nor the common pleas court's decision in *Friendship*, Franklin C.P. No. 15CVF-8721 (Mar. 7, 2016), support a different result.

{¶ 9} Friendship appealed the adjudicating committee's decision to the administrator's designee. *See* R.C. 4123.291(B) ("An employer who is adversely affected by a decision of an adjudicating committee appointed by the administrator may appeal the decision of the committee to the administrator or the administrator's designee"). The designee affirmed, reasoning "that there is sufficient control by

Friendship over the activities of the workers to conclude that the workers are employees of Friendship."

{¶ 10} In December 2019, Friendship filed a complaint for a writ of mandamus in the Tenth District, seeking an order directing the bureau to classify its in-home direct-care workers as independent contractors and reimburse Friendship for the premiums it incurred as a result of the bureau's classification. A magistrate determined that the bureau had not abused its discretion in concluding that the workers are Friendship's employees and recommended that the court of appeals deny the writ. 2021-Ohio-4490, ¶ 64. Friendship filed objections to the magistrate's order, which the court of appeals sustained in part. The court of appeals granted a writ of mandamus, ordering the bureau to vacate its order classifying Friendship's direct-care workers as employees and ordering the bureau to return any premium payments that Friendship had made based on the order of the administrator's designee. *Id.* at ¶ 35. The bureau appealed.

## II. ANALYSIS

{¶ 11} We must determine whether the bureau abused its discretion in determining that Friendship's in-home direct-care workers are employees. *See State ex rel. Daily Servs., L.L.C. v. Morrison*, 154 Ohio St.3d 498, 2018-Ohio-2151, 116 N.E.3d 112, ¶ 17. To make this determination, we examine whether the bureau's order is "adequately explain[ed]," *State ex rel. Craftsmen Basement Finishing Sys., Inc. v. Ryan*, 121 Ohio St.3d 492, 2009-Ohio-1676, 905 N.E.2d 639, ¶ 15, and is supported with " 'some evidence in the record,' " *State ex rel. Ugicom Ents., Inc. v. Morrison*, 169 Ohio St.3d 244, 2022-Ohio-1689, 203 N.E.3d 683, ¶ 14, quoting *State ex rel. Digiacinto v. Indus. Comm.*, 159 Ohio St.3d 346, 2020-Ohio-707, 150 N.E.3d 933, ¶ 13. We review the judgment of a court of appeals in a mandamus action as if it had been filed originally in this court. *State ex rel. Armatas v. Plain Twp. Bd. of Trustees*, 163 Ohio St.3d 304, 2021-Ohio-1176, 170 N.E.3d 19, ¶ 12.

{¶ 12} Relevant here are the common-law factors for deciding whether a person is an employee or independent contractor for workers' compensation purposes. "Whether someone is an employee or an independent contractor is ordinarily an issue to be decided by the trier of fact. The key factual determination is who had the right to control the manner or means of doing the work." *Bostic*, 37 Ohio St.3d at 145-146, 524 N.E.2d 881.

{¶ 13} "The right-to-control test is not marked by a bright-line rule but rather a set of nonexhaustive factors." *Ugicom* at ¶ 16. In *Gillum*, this court recognized the following factors as indicative, though not dispositive, of the existence of an independent-contractor relationship:

> "the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price, the independent nature of his business or his distinct calling, his employment of assistants with the right to supervise their activities, his obligation to furnish necessary tools, supplies, and materials, his right to control the progress of the work except as to final results, the time for which the workman is employed, the method of payment, whether by time or by job, and whether the work is part of the regular business of the employer."

*Id.* at 375, 48 N.E.2d 234, quoting 27 American Jurisprudence, Indicia of Relationship, Section 5, at 485; *see also Bostic* at 146 (other factors may include "who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts").

**{¶ 14}** The bureau's main argument on appeal is that the Tenth District reweighed the evidence when it concluded that the bureau had abused its discretion in determining that Friendship's direct-care workers are employees. In the bureau's view, its order rests on reasoning that is fully explained and on findings that are grounded in some evidence in the record.[1] Before examining whether the bureau is correct, we note two things: First, although the bureau's order does not clearly identify the particular factors of the right-to-control test it considered or specify how certain aspects of the relationship between Friendship and the direct-care workers relate to a particular factor,[2] we arrange our analysis under headings that correspond best with the findings addressed in the bureau's order. Second, because this appeal tests the sufficiency of the evidence supporting the bureau's order, we do not analyze factors that the bureau itself did not analyze in making its decision. *See State ex rel. Yellow Freight Sys., Inc. v. Indus. Comm.*, 71 Ohio St.3d 139, 142, 642 N.E.2d 378 (1994) ("evidentiary review is limited to the evidence and reasoning identified *in* the order" [emphasis sic]).

*A. Analyzing the factors of the right-to-control test*

### 1. DDD's regulation of Friendship

**{¶ 15}** The bureau found it significant that at the time of the 2017 audit, DDD characterized Friendship as an "agency provider," meaning "an entity that directly employs at least one person in addition to the chief executive officer for the purpose of providing services for which the entity must be certified in accordance with rule 5123:2-2-01 of the Administrative Code." Former Ohio

---

1. The bureau also suggests that the court of appeals invoked collateral estoppel to prevent it from litigating whether the direct-care workers are employees or independent contractors. The bureau is mistaken. The court of appeals plainly held that *Friendship*, Franklin C.P. No. 15CVF-8721 (Mar. 7, 2016), was not binding on the bureau. 2021-Ohio-4490 at ¶ 18.

2. Because the order of the administrator's designee adopted the adjudicating committee's statement of the facts and affirmed the "rationale set forth in the [committee's] order," we will review the analysis advanced in the orders of both the adjudicating committee and the administrator's designee.

Adm.Code 5123:2-9-06(B)(1), 2016-2017 Ohio Monthly Record 2-2583, effective Apr. 1, 2017. Yet, DDD's regulation of Friendship does not speak to whether Friendship exerts control over its work relationship with the direct-care workers. And former Ohio Adm.Code 5123:2-9-06(B)(1) says nothing about the factors for determining whether a worker providing direct care to consumers should be characterized as an employee or independent contractor for workers' compensation purposes. We conclude that DDD's regulation of Friendship is not evidence that supports the bureau's classification of Friendship's direct-care workers as employees.

### 2. Insurance

{¶ 16} The bureau stated that the "workers are required to have their own insurance, at their own expense, and Friendship only carries insurance on the business." That statement alone does not specify what type of insurance Friendship requires the direct-care workers to carry, but the parties agree on appeal that Friendship requires its direct-care workers to have their own automobile insurance per state-law requirements. Whether insurance coverage is provided and who provides the coverage is a relevant aspect of a work relationship. *See Bostic*, 37 Ohio St.3d at 147, 524 N.E.2d 881 (observing that the worker's failure to "fill out the health insurance forms required of [the company's] employees" was evidence from which a fact-finder could reasonably conclude that the worker was an independent contractor). We conclude that Friendship does not exert control over a facet of the work relationship with its direct-care workers by requiring that the workers carry their own automobile insurance, because even if the direct-care workers were not involved with Friendship, they would still be required by law to maintain insurance coverage per state-law requirements.

### 3. Method of payment

{¶ 17} The bureau determined that Friendship's direct-care workers are paid hourly, a fact that is reflected in the 2017 audit report and that tends to support

the existence of an employer-employee relationship.[3] *See Walker v. Lahoski*, 9th Dist. Summit No. 19293, 1999 WL 548978, *2 (July 28, 1999) ("If the worker is paid on an hourly basis, this tends to indicate that the worker was an employee"). But the bureau also determined that the workers are issued Forms 1099 rather than Forms W-2, a fact that is reflected in the 2017 audit report and that tends to show the existence of an independent-contractor relationship. *See Northeast Ohio College of Massotherapy v. Burek*, 144 Ohio App.3d 196, 203-204, 759 N.E.2d 869 (7th Dist.2001). Because the bureau's analysis regarding these two aspects of how Friendship pays its direct-care workers is supported by some evidence in the record, we conclude that these findings effectively cancel each other out.

### 4. Part of Friendship's regular business

{¶ 18} The bureau determined that the direct-care workers "provid[e] their personal labor in the normal course of Friendship Supported Living's business pursuit." The bureau argues that this is a relevant aspect of Friendship's relationship with its direct-care workers and one that is supported by some evidence in the record. The bureau is correct. In analyzing a person's work status, it matters "whether the work is part of the regular business of the employer." *Gillum*, 141 Ohio St. at 375, 48 N.E.2d 234, quoting 27 American Jurisprudence, Section 5, at 485. And here, the bureau's auditor found in 2017 that the direct-care workers' "[s]ervices are integrated into the functioning of [Friendship, which] is in the business to provide home health [services]." Some evidence in the record, therefore, supports the bureau's determination regarding this factor of the right-to-control test.

---

3. Friendship says that the DDD requires it to pay the direct-care workers on an hourly basis. But the UCRC transcript, which Friendship cites in support of this statement, is silent on this point.

### 5. Arranging consumer coverage

{¶ 19} The bureau found it significant that when a direct-care worker is unavailable to provide services to a consumer, Friendship is then responsible for arranging for another direct-care worker to provide services for that consumer. There is some evidence in the record to support this finding because the 2017 audit report states that the workers could not hire someone to fill in for them. Although this finding by the bureau is not directly traceable to one of the common-law right-to-control factors listed above, that is not fatal to the bureau's determination, because those factors do not exhaust what the bureau may consider. *See Ugicom*, 169 Ohio St.3d 244, 2022-Ohio-1689, 203 N.E.3d 683, at ¶ 16 (describing the right-to-control test as consisting of a "set of nonexhaustive factors"). Rather, as previously stated, "[t]he key factual determination is who had the right to control the manner or means of doing the work." *Bostic*, 37 Ohio St.3d at 146, 524 N.E.2d 881. By restricting the direct-care workers from arranging coverage for a consumer when they are unavailable to personally provide the required services, Friendship exerts control over how they do their work.

### 6. Friendship's classification of the direct-care workers as independent contractors

{¶ 20} Friendship has its direct-care workers sign an agreement classifying them as independent contractors. But the bureau rejected as irrelevant Friendship's characterization of the work relationship with its direct-care workers, concluding that "[t]he underlying facts and true nature of the relationship speaks for itself." We conclude that the bureau did not abuse its discretion in determining that this evidence is not probative of the work relationship. *See Ugicom* at ¶ 35 (bureau did not abuse its discretion in failing to credit the fact that an employer labeled its workers as independent contractors by entering into an independent-contractor agreement with them).

### 7. The common pleas court's decision and the prior audits

{¶ 21} The bureau determined that the common pleas court's decision in *Friendship*, Franklin C.P. No. 15CVF-8721 (Mar. 7, 2016), is instructive on how to classify workers for unemployment-compensation purposes but not for workers' compensation purposes. It also determined that its auditor's findings from prior audits had no bearing on its analysis of the 2017 audit. Although Friendship asserts that the common pleas court's findings in *Friendship* and the prior audit findings by the bureau bolster its argument that the direct-care workers are independent contractors, Friendship cites no authority in support of its contention that the bureau abuses its discretion when it fails either to follow a common pleas court's decision regarding a worker's classification for unemployment-compensation purposes or to assign probative weight to findings from one of its earlier audits. It follows that the bureau did not abuse its discretion in failing to factor the common pleas court's decision in *Friendship* and its own prior audits into its analysis of the 2017 audit.

### 8. The direct-care workers' freedom while interacting with the consumers

{¶ 22} The bureau noted that a direct-care worker and a consumer mutually decide what they will do while the worker is in the consumer's home. It reasoned, however, that this has no bearing on whether Friendship controls the work relationship with the direct-care workers, because "autonomy and flexibility [are] common for employees in this field and many other types of work." But the bureau's order cites no evidence justifying this latter statement, and thus, the bureau's note regarding the mutual decisions made by the direct-care workers and the consumers must be understood as a sign of Friendship's lack of control over the workers while they are in the consumers' homes.

### 9. Monitoring and compliance

{¶ 23} The bureau determined that Friendship supervises the direct-care workers by "monitoring their activities for compliance and quality," and the bureau echoes this point on appeal. In one sense, there is some evidence in the record to

support this finding: the bureau's 2017 audit found that each "[w]orker's activities are monitored for compliance and quality." But beyond this, the bureau's order provides no specifics about what the "monitoring" consists of. It is not enough for the bureau to perfunctorily say that something is so. *See Craftsmen Basement Finishing Sys., Inc.*, 121 Ohio St.3d 492, 2009-Ohio-1676, 905 N.E.2d 639, at ¶ 18 (rejecting the bureau's position that "if the bureau says something is so, it is so, and that is explanation enough"). The bureau's failure to specify the type and extent of Friendship's monitoring activities of the direct-care workers frustrates our ability to discern whether some evidence in the record supports its conclusion concerning these activities.

    *B. Deficiencies in the bureau's order require that we grant a limited writ*

{¶ 24} Ordinarily at this point, we would determine whether "the bureau's conclusions under the factors [are] rooted in some evidence in the record." *Ugicom*, 169 Ohio St.3d 244, 2022-Ohio-1689, 203 N.E.3d 683, at ¶ 44. But we are able to do so only if the bureau has weighed the individual facts of the case against the relevant factors of the right-to-control test, which is something that must be done in this type of analysis. *See Bostic*, 37 Ohio St.3d at 146, 524 N.E.2d 881. We agree with Friendship that the bureau failed to consider the totality of the circumstances in light of the relevant factors espoused in the caselaw, but we disagree that this failure compels affirmance of the Tenth District's decision.

**1. Deficiencies in the bureau's order**

{¶ 25} The bureau's order is marred by three deficiencies. First, as noted, the bureau found it significant that Friendship monitors the direct-care workers for "compliance and quality," but it did not specify what these monitoring activities consist of. This is significant not just because Friendship denies that it supervises the direct-care workers. If Friendship's monitoring consists of no more than checking that the direct-care workers are carrying out their job duties pursuant to the agreement for hire, then that would not be " 'an assumption by the employer of

the right to control the person employed as to the details or method of doing the work.' " *Gillum*, 141 Ohio St. at 382, 48 N.E.2d 234, quoting 27 American Jurisprudence, Section 7, at 488. The reference to worker oversight by a case manager or a nurse in the bureau's 2017 audit report does not alter this conclusion, because it is not obvious from the report that the case managers and nurses that perform the oversight function are affiliated with Friendship. If they are not so affiliated, their oversight would not be a mark of Friendship's control over the direct-care workers. *See Ugicom* at ¶ 40. Nor is it sufficient for the bureau to rely on the fact that the home-health industry in general relies on supervisors to monitor the activities of in-home health workers, because the "individual facts of each case" must drive the analysis, *Bostic* at 146.

**{¶ 26}** Second, despite acknowledging that a person's engagement in an independent business is a factor of prime importance, *see Ugicom* at ¶ 18, the bureau glossed over an important component of this factor, namely, one's freedom to work for others, *see Gillum* at 379 (evidence supported that worker was an independent contractor who "was exercising an independent employment—that of hauling for others in his own truck and with his own help"); *Ehrhardt v. Chatlain Ents., Inc.*, 5th Dist. Richland No. 10CA123, 2011-Ohio-3223, ¶ 34, 37 (truck driver was free to haul loads for those other than his purported employer). Even though Friendship points to evidence suggesting that its direct-care workers can (and do) work for others and that the bureau's 2017 audit report found nothing to the contrary, the bureau did not address this aspect of the work relationship.

**{¶ 27}** Third, Friendship correctly points out that the bureau ignored the routes-travelled and length-of-employment factors. As to the latter, in its 2017 audit report, the bureau noted that the direct-care workers could apply to become Friendship employees after 24 months. But this does not speak to how long the direct-care workers actually work for Friendship or whether the work is general or continuous. *See Gillum* at 379 (observing that the worker "was not employed

generally or continuously"). Notable here is that Friendship points to evidence in the record that its direct-care workers had latitude over the length of their work relationship with Friendship.

{¶ 28} Friendship overreaches, however, in asserting that there are other deficiencies in the bureau's order. Although it is true that the bureau did not analyze who controls the direct-care workers' hours and consumer assignments with the same level of depth that it analyzed other aspects of the work relationship between the workers and Friendship, the bureau nevertheless quoted the 2017 audit findings stating that Friendship "performs all scheduling of days and times when the [worker] is to work," citing the relevant factors of the right-to-control test from the caselaw, and concluding that the audit findings should be upheld. Although thin, the bureau's reasoning is discernable.

### 2. Limited writ

{¶ 29} In arguing for affirmance of the Tenth District's decision, Friendship points to *State ex rel. Gassman v. Indus. Comm.*, 41 Ohio St.2d 64, 65, 322 N.E.2d 660 (1975), in which this court observed that "[a] mandatory writ may issue against the Industrial Commission if the commission has incorrectly interpreted Ohio law." But that case concerned the proper interpretation of a statute; here, in contrast, we are concerned with the application of factors of the right-to-control test that are drawn from the caselaw.

{¶ 30} Although there does not appear to be a case directly on point, an analogy can be drawn to what we have done after concluding that the Industrial Commission has failed to sufficiently account for the factors announced in the caselaw for determining the scope of a person's eligibility for permanent-total-disability compensation. *See State ex rel. Nicholson v. Copperweld Steel Co.*, 77 Ohio St.3d 193, 198-200, 672 N.E.2d 657 (1996) (holding that the commission's failure to consider a claimant's age, work experience, education, and other relevant nonmedical or vocational characteristics as required by *State ex rel. Stephenson v.*

*Indus. Comm.*, 31 Ohio St.3d 167, 509 N.E.2d 946 (1987), when considering a claimant's application for permanent-total-disability compensation constituted an abuse of discretion for which mandamus was the remedy). In that type of case, the proper remedy is to grant a limited writ of mandamus ordering the commission to issue an amended order that accounts for the factors to be considered by furnishing reasons that are briefly explained and statements that are fact-specific. *Id.* at 198, citing *State ex rel. Noll v. Indus. Comm.*, 57 Ohio St.3d 203, 206, 567 N.E.2d 245 (1991) ("meaningful review can be accomplished only if the commission prepares orders on a case-by-case basis which are fact-specific and which contain reasons explaining its decisions").

**{¶ 31}** Extending that logic here, we conclude that the proper remedy is to reverse the judgment of the court of appeals and grant a limited writ of mandamus ordering the bureau to issue an amended order that sufficiently accounts for the deficiencies identified above with reasons that are briefly explained and statements that are fact-specific. *See State ex rel. Ochs v. Indus. Comm.*, 85 Ohio St.3d 674, 675-676, 710 N.E.2d 1126 (1999) (determining that the explanation requirement applicable to the Industrial Commission's decisions as set forth in *Noll* likewise applies to the bureau's orders).

### III. CONCLUSION

**{¶ 32}** For the foregoing reasons, we reverse the judgment of the Tenth District Court of Appeals and grant a limited writ of mandamus ordering the bureau to issue an amended order.

Judgment reversed

and limited writ granted.

FISCHER, DONNELLY, STEWART, and BRUNNER, JJ., concur.

KENNEDY, C.J., concurs, with an opinion joined by DEWINE and DETERS, JJ.

————————

**KENNEDY, C.J., dissenting.**

**{¶ 33}** Because the order of appellant, the Ohio Bureau of Workers' Compensation ("BWC"), finding that appellee, Friendship Supported Living, Inc., misclassified its in-home care providers as independent contractors is not supported by sufficient evidence in the record, I would affirm the judgment of the Tenth District Court of Appeals granting a writ of mandamus to compel the BWC to vacate its decision. The majority does otherwise, and I therefore dissent.

### The Issue Presented

**{¶ 34}** At issue in this case is whether Friendship improperly classified its in-home care providers as independent contractors rather than employees for whom it must pay workers' compensation premiums. "Because an independent contractor is not an employee for purposes of workers' compensation law," resolving whether a person is an independent contractor or an employee "determines the employer's obligation to contribute to * * * the State Insurance Fund." *Bostic v. Connor*, 37 Ohio St.3d 144, 145, 524 N.E.2d 881 (1988).

**{¶ 35}** In deciding whether a worker is an employee or an independent contractor, "[t]he key factual determination is who had the right to control the manner or means of doing the work." *Id.* at 146. "If the employer has this right to control, the worker is his employee. However, if the employer is merely interested in the result and does not retain the right to direct the manner in which the work is completed, the relationship is that of employer and independent contractor." *Marshall v. Aaron*, 15 Ohio St.3d 48, 49, 472 N.E.2d 335 (1984).

**{¶ 36}** Although "[t]he determination of who has the right to control must be made by examining the individual facts of each case," *Bostic* at 146, "where the evidence is not in conflict or the facts are admitted, the question of whether a person is an employee or an independent contractor is a matter of law," *id.* "Unlike determinations of fact which are given great deference, questions of law are reviewed by a court de novo." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*,

73 Ohio St.3d 107, 108, 652 N.E.2d 684 (1995). And " '[n]o court—not a trial court, not an appellate court, nor even a supreme court—has the authority, within its discretion, to commit an error of law.' " (Brackets added.) *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 38, quoting *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 26 (2d Dist.). The same is true of the BWC.

**{¶ 37}** Because the evidence presented in this case is not in conflict, our review is de novo. The relevant facts in the record are contained in the testimony of Jerry M. Hein Sr. and Florence Hein, who operate Friendship.

### The Undisputed Facts

**{¶ 38}** Jerry Hein Sr. explained in an affidavit that Friendship provides services to people (called "consumers" or "customers" by Friendship) who have had an Individual Service Plan ("ISP") prepared by the Franklin County Board of Developmental Disabilities, specifying the types of services to be provided to the consumer and the number of hours that services are to be provided. Consumers with an ISP are "free to deviate, change or delete services as the consumer deems appropriate." In-home care providers are "required to comply with the services, subject to modification by the consumer, as designated by the ISP * * *. The manner and means of providing those specified services is at the direction of the consumer." According to Jerry, Friendship "does not supervise or in any way manage the services provided by the [in-home care providers] on a particular day. There is no on-site supervision." Friendship does have employees whose job duties differ from those of the in-home care providers; those employees contact the consumers to ensure that "the [consumer] is, for example, treated fairly, that sufficient groceries are at the residence, that the [consumer] is taking medication as ordered, and that the appropriate activities have been provided."

**{¶ 39}** Friendship's in-home care providers determine the number of hours that they will work; Jerry attested that "[t]he specific hours of service of the

independent contractor [i.e., the in-home care provider] are determined by the independent contractor." In fact, he went on to note that "[t]he independent contractor is free to not show up on a particular day." Jerry also pointed out that in-home care providers are not even required to devote their full time to Friendship, that most of them have second jobs, and that 80 percent of them also work for Friendship's competitors.

{¶ 40} Jerry explained that "[t]he independent contractor relationship * * * is intended to be short-term, as many independent contractors have second jobs or are enrolled in school. Most independent contractors are looking for short-term arrangements."

{¶ 41} Friendship does not reimburse the expenses of its in-home care providers or provide them with benefits, although the state reimburses the providers' mileage. Friendship does not supply its in-home care providers with tools or materials, nor does it provide them with facilities in which to provide the consumers with services. The written agreement for hire between Friendship and its in-home care providers specifies that the in-home care providers are independent contractors, and Friendship issues them Internal Revenue Service ("IRS") Form 1099.

{¶ 42} In her affidavit, Florence Hein incorporated the sworn testimony that she had provided to the Ohio Unemployment Compensation Review Commission in a separate proceeding, which resulted in the determination that one of Friendship's in-home care providers was an independent contractor. *See Friendship Supported Living, Inc. v. Dir., Ohio Dept. of Job & Family Servs.*, Franklin C.P. No. 15CVF-8721 (Mar. 7, 2016). She explained that Friendship pays its in-home care providers an hourly rate and gives them the choice of receiving a weekly or biweekly paycheck. The in-home care providers control the days and hours that they work. Once the in-home care provider is at a consumer's home, Friendship does not dictate what the provider does that day or how the work is

performed—"the contractor and the consumer really control[ ] what's happening that day. * * * When a shower happens, when a grocery store is [visited], when a movie is taken in, any of that, [Friendship is] out of that loop and it's between the consumer and the [provider]." Florence testified that in-home care providers are not supervised by Friendship, but she noted that if a consumer has a concern about a provider, the consumer may contact her or one of Friendship's employees. Friendship does not provide the in-home care providers with training or supply them with any tools or materials, and the providers have to supply their own insurance and vehicle. The only expense that Friendship reimburses is mileage, which the state, in turn, reimburses to Friendship.

**{¶ 43}** Florence acknowledged that Friendship does not permit its in-home care providers to subcontract out their assignments to provide services for Friendship's consumers "because of the requirements that [Friendship has] to work within [its] contract with the state." In-home care providers may decline to work with a particular consumer, and if a provider is unable to care for an assigned consumer, one of Friendship's employees provides coverage until the assigned provider is able to return to the assignment or another in-home care provider is able to take over the services. Friendship does not guarantee in-home care providers a certain number of hours of work—if there is no work available, the provider does not get paid. In-home care providers have flexibility in determining the hours that they do work; the ISP dictates the number of hours and the time frames within which that consumer can receive services, but Florence testified that this is controlled by the state, not by Friendship.

**{¶ 44}** Florence explained that it is standard in the industry for in-home care providers to be independent contractors; she noted that the state and other competitors provide the same services using independent contractors. She also pointed out that Friendship has in-home care providers who work for other service providers in addition to working for Friendship.

**Application of the Right-to-Control Test**

{¶ 45} This court has pointed to the following factors as guiding the determination of who has the right to control the manner or means of doing work:

> "[T]he existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price, the independent nature of his business or his distinct calling, his employment of assistants with the right to supervise their activities, his obligation to furnish necessary tools, supplies, and materials, his right to control the progress of the work except as to final results, the time for which the workman is employed, the method of payment, whether by time or by job, and whether the work is part of the regular business of the employer."

*Gillum v. Indus. Comm.*, 141 Ohio St. 373, 375, 48 N.E.2d 234 (1943), quoting 27 American Jurisprudence, Indicia of Relationship, Section 5, at 485.

{¶ 46} In applying the right-to-control test, some of the facts of this case might seem to favor a determination that the in-home care providers are employees, not independent contractors. For example, Friendship pays its in-home care providers an hourly rate with a weekly or biweekly paycheck rather than paying them a fixed price for the services they provide. However, this is a requirement dictated by the state: the state reimburses Friendship for its payments to the in-home care providers based on the number of hours Friendship submits. Also, Friendship prohibits its in-home care providers from arranging for their own substitutes or from otherwise subcontracting out their assignments to Friendship's consumers. But again, this is dictated by the state; Florence acknowledged during her testimony in a separate, unrelated action that the prohibition against subcontracting is "because of the requirements that [Friendship has] to work within

[Friendship's] contract with the state." She also suggested that subcontracting is not permitted because the in-home care providers are not certified by the state to allow others to provide services on their behalf. In these circumstances, then, the payment of an hourly rate and the prohibition against subcontracting are consistent with an independent-contractor relationship.

{¶ 47} Applying the remaining factors of the right-to-control test also demonstrates that the in-home care providers are independent contractors. Although both Friendship and its in-home care providers operate in a related field by providing services to people with developmental disabilities, the work that each performs is separate. Friendship matches its consumers with in-home care providers who provide identified services to those consumers under an ISP. And the evidence shows that the in-home care providers operate their own independent businesses, because they are permitted to, and do sometimes, work with Friendship's competitors in the same line of business. The evidence also shows that providing services under an ISP to people with developmental disabilities using independent contractors is the industry standard—both the state and Friendship's competitors use independent contractors for this purpose. Friendship's practices are consistent with this standard; its contracts for hire create an independent-contractor relationship with the in-home care providers, and it reports each provider's income to the IRS on Form 1099.

{¶ 48} Further, the actions of Friendship and its in-home care providers reflect an independent-contractor relationship. The in-home care providers largely set their own schedules, deciding how many hours and days they work each week and what times they will arrive at the consumers' homes. The only limitation is that their work must be consistent with their assigned consumer's ISP, which is, again, created by the state. Likewise, Friendship does not guarantee its in-home care providers a particular number of hours of work each week; if there is no work available, they do not get paid.

**{¶ 49}** The in-home care providers provide care as outlined in the ISP. In doing that, the in-home care providers and Friendship's consumers direct the means and manner in which the services are provided on a day-to-day basis. Friendship does not control what work is performed or how it is performed on a given day. Friendship provides no training, tools, or materials for the in-home care providers to complete their work. The only evidence of record is that Friendship does not supervise the specific manner and means by which services are provided to its consumers, although Friendship does confirm that services are actually and sufficiently provided pursuant to the consumer's ISP. That is, Friendship is only concerned with the final result of the job, not how the job is accomplished. And "if the employer is merely interested in the result and does not retain the right to direct the manner in which the work is completed, the relationship is that of employer and independent contractor." *Marshall*, 15 Ohio St.3d at 49, 472 N.E.2d 335.

**{¶ 50}** For these reasons, it is manifest that Friendship's in-home care providers are independent contractors, not employees.

**{¶ 51}** In addition, I disagree with the majority's decision to remand this matter to the BWC, giving it a second chance to justify its determination that Friendship's in-home care providers are employees, not independent contractors. This case is unlike the situation we confronted in *State ex rel. Nicholson v. Copperweld Steel Co.*, 77 Ohio St.3d 193, 672 N.E.2d 657 (1996), on which the majority relies. There, this court determined that the Industrial Commission had abused its discretion in denying a workers' compensation claimant's application for permanent-total-disability compensation because it had not issued an order that was fact-specific and that contained the reasons explaining its decision. This court rejected the agency's practice of failing to specify the basis of its decision and informing the claimant only that "requested benefits are either being granted or denied based on 'the evidence in the file and/or the evidence adduced at the hearing.' " *State ex rel. Mitchell v. Robbins & Myers, Inc.*, 6 Ohio St.3d 481, 483,

453 N.E.2d 721 (1983), quoting *State ex rel. Berry v. Indus. Comm.*, 4 Ohio St.3d 193, 196-198, 448 N.E.2d 134 (1983) (Clifford F. Brown, J., concurring). That is not the situation here. In this case, the BWC gave its reasons for finding that Friendship's in-home care providers are employees rather than independent contractors. But those reasons are simply unsupported by the record. And a remand to the BWC would be futile, because the evidence does not support the conclusion that Friendship's in-home care providers are employees rather than independent contractors.

**{¶ 52}** For these reasons, I would affirm the judgment of the Tenth District Court of Appeals granting a writ of mandamus to compel the BWC to vacate its decision reclassifying Friendship's in-home care providers as employees for purposes of Ohio's workers' compensation laws. Because the majority does not, I dissent.

DEWINE and DETERS, JJ., concur in the foregoing opinion.

_____

Law Office of Tracy L. Turner, L.L.C., and Tracy L. Turner, for appellee.

Dave Yost, Attorney General, and John Smart, Assistant Attorney General, for appellant.

_____